UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEREL JONES,                          )
                                      )
            Plaintiff,                )
                                      )    No. 4:08CV01472 FRB
                                      )
      v.                              )
                                      )
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.   Procedural Background

The record indicates that plaintiff's mother filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act") on behalf of plaintiff Jerel Jones ("plaintiff"), alleging disability as of April 3, 2006, due to asthma, a learning disability, and attention-deficit-hyperactivity disorder ("ADHD").[1]  (Administrative Transcript ("Tr.") 66-69).  Plaintiff's application was denied, and on July

---

[1]The record indicates that plaintiff was born on April 16, 1989, and was therefore a minor when his application was filed, but reached age 18 before the date of his administrative hearing.  (Tr. 14, 18, 57).

25, 2007, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 14-27; 228-60). On August 5, 2007, the ALJ issued his decision denying plaintiff's application. (Tr. 14-27). Plaintiff subsequently filed a request for review of this decision with defendant agency's Appeals Council, which granted plaintiff's request for additional time before taking action on plaintiff's case. (Tr. 8-10). On August 15, 2008, the Appeals Council denied plaintiff's request for review. (Tr. 3-7). The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).


## II.  Evidence Before the ALJ

### A.  Hearing Testimony

During the administrative hearing, plaintiff was represented by attorney Jeffrey Bunten.[2] Plaintiff testified that he was eighteen years of age; five feet, six inches tall; 125 pounds; and right-handed. (Tr. 233). He testified that he lives at home with his mother and younger sister, and planned to return to high school for his senior year in the fall. (Id.) Plaintiff testified that he was an "honor roll student" at Marquette High School. (Tr. 237). The ALJ noted that plaintiff had achieved

_____

[2]At the outset of the hearing, the ALJ asked plaintiff's attorney to explain the status of criminal charges for stealing, which were pending against plaintiff, and plaintiff's attorney explained that criminal matters were pending in both St. Louis City and St. Louis County, and that plaintiff was being represented by counsel. (Tr. 231-32).

grades of A and B while a student at Crestview Middle School, and plaintiff testified that math was his favorite subject.  (Id.) Plaintiff testified that, in school, he was given special help with subjects he did not understand.  (Tr. 234).  Plaintiff's attorney indicated that plaintiff had attained I.Q. scores of 93 and 91. (Id.)

Plaintiff testified that, two months prior to the hearing, he had spent two weeks working as a house cleaner.  (Tr. 235).  Plaintiff testified that he did not feel he could do this work for forty hours per week on an ongoing basis because the dust made him wheeze and cough, and he had to use a mask.  (Tr. 239).

Plaintiff testified that he was unable to perform any work because he became short of breath due to asthma.  (Tr. 235). Plaintiff testified that he used to smoke two packs of cigarettes per day, but had reduced his daily consumption to three or four cigarettes.  (Id.)

Plaintiff testified that his current prescriptions included  Singulair,[3]  Advair,[4]  and  Prednisone.[5]   (Tr.  237).

---

[3]Singulair, or Montelukast, is used to prevent breathing difficulties and other symptoms associated with asthma and with exercise.  It is also used to treat the symptoms of seasonal and perennial allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a600014.html

[4]Advair is a combination of Fluticasone and Salmeterol, and is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and COPD. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

[5]Prednisone is used to treat symptoms associated with low corticosteroid levels, and is also used to treat severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

Plaintiff testified that he used an inhaler each day before becoming physically active. (Tr. 238). He testified that he used a nebulizer six or seven times per year, "depending how the weather goes," and also testified that he experienced wheezing between asthma attacks. (<u>Id.</u>) He testified that he took a three-day course of Prednisone "three weeks ago" when he had chest pains and wheezing. (Tr. 239).

Plaintiff testified that he had no emergency room treatment or hospitalizations for asthma during the year 2007, but that he did have one emergency room visit, and one five-day hospitalization, due to asthma in 2006. (Tr. 240). Plaintiff testified that his Advair dosage had been increased in the last two months, but he did not know the reason. (Tr. 240-41). He testified that, between emergency room visits, he had asthma attacks two or perhaps three times per month. (Tr. 241). Plaintiff was asked what he did when he had an asthma attack, and he testified as follows: "First I'll talk to my mother. I'll tell her that I may need to go to the ER, or she just might just help me with using my nebulizer, just fill up my machine up and then I just use that and if that doesn't work I just end up going to the emergency room." (<u>Id.</u>)

Plaintiff testified that he had never tried to get a driver's license, stating that if he were to have an asthma attack while driving, he could hurt himself or others, and he thought he should therefore "just wait." (Tr. 242). Plaintiff testified that

he had no problems with walking, standing, sitting, or using his hands. (Id.)

Plaintiff described an asthma attack as a tightening of his chest, and difficulty catching his breath. (Tr. 243). Plaintiff testified that he had not had an asthma attack that year, and stated that his last asthma attack occurred on April 4, 2006. (Id.) Plaintiff testified that he usually had asthma attacks in April, around the time of his birthday. (Tr. 244).

The ALJ then heard testimony from Henry Onken, M.D. (Tr. 244). Dr. Onken testified that he had not examined plaintiff, but had thoroughly reviewed his medical records. (Tr. 246). Dr. Onken testified that plaintiff would be able to stand and sit. (Tr. 250). The ALJ and Dr. Onken discussed the fact that the medical evidence contained conflicting statements regarding whether plaintiff's asthma was controlled or uncontrolled, and Dr. Onken testified that he could not resolve the conflict, but that it appeared that both medical treatment providers were impressed by plaintiff's long history of severe asthma, and that one had noted plaintiff's recent improvement. (Tr. 251). Dr. Onken testified that plaintiff's asthma required a lot of medication, and was a severe problem. (Tr. 252). Dr. Onken testified that, with medication, plaintiff could have a normal life, but should not run. (Id.) It was noted that, in the past, plaintiff had filed at least three disability claims. (Tr. 252-53).

Dr. Onken testified that plaintiff took corticosteroids

once or twice per month, a regimen that seemed to "take care of things." (Tr. 253). Dr. Onken testified that corticosteroids were known to cause side effects, including salt retention and impaired wound healing. (Tr. 253-54). Dr. Onken testified that it appeared that plaintiff had low-grade wheezing between asthma attacks. (Tr. 254).

The ALJ then heard testimony from Shanda Catching, plaintiff's mother. Ms. Catching testified that she treats plaintiff for wheezing at home, and that is why he does not require emergency room visits. (Tr. 256). Ms. Catching testified that plaintiff had experienced three asthma attacks during 2007, but not to the point that he required emergency room treatment. (Tr. 256-57). Ms. Catching testified that smoking triggered plaintiff's asthma, and she herself was a smoker. (Tr. 257). Plaintiff then testified that he smoked "about six cigarettes" per day. (Tr. 253). Ms. Catching testified that plaintiff had missed two weeks of school due to his asthma. (Id.)

B.    Medical Records[6]

The record indicates that plaintiff was treated at the Grace Hill Neighborhood Health Center from November 22, 2000 through April 23, 2001. (Tr. 153-78). These records include

---

[6]The Administrative Transcript contains medical information predating plaintiff's alleged onset date. These records will be included in the following summary, to the extent they are relevant to the instant matter.

"Friends of Asthmatics in the Neighborhoods" documentation forms, indicating that plaintiff took Albuterol,[7] Singulair, and Flovent;[8] that his home was clean and neat; that he knew his medication; and that he was doing well in school. (Tr. 153-78).

The record indicates that, on June 21, 2004, plaintiff saw Carolyn L. Cannon, M.D., at St. Louis Children's Hospital, for a first-time asthma evaluation. (Tr. 205-06). Dr. Cannon noted that plaintiff had been asthmatic since age four, and averaged two hospital admissions per year due to asthma. (Tr. 205). Dr. Cannon noted that plaintiff frequently required corticosteroids and frequently missed school, but was "quite noncompliant" with his maintenance medications, and took medication only when sick. (Id.) She noted that his worst months were in April and May, and that he did not have indoor precipitants. (Id.)

Lung function testing was performed, and plaintiff's FEV[9] values were consistent with a moderate to severe obstructive process, with marked bronchial reactivity. (Tr. 206). Allergy

---

[7]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[8]Flovent, or Fluticasone oral inhalation, is used to prevent breathing difficulties, chest tightness, wheezing and coughing caused by asthma. Fluticasone is in a class of medications called corticosteroids. It works by decreasing swelling and irritation in the airways to allow for easier breathing. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601056.html

[9]FEV stands for "Forced Expiratory Volume," and is the result obtained during Spirometry, or lung function, testing. The FEV value reflects how well a person can hold air in his lungs, and how much air he can exhale after taking a deep breath.

skin testing revealed allergies to numerous environmental irritants, including trees and mold. (<u>Id.</u>)

The record indicates that plaintiff presented to the emergency room of St. Louis Children's Hospital on February 21, 2006 with complaints of cough and wheezing, and was diagnosed with an asthma exacerbation. (Tr. 200). He was advised to use Albuterol and Prednisone. (Tr. 201).

The record indicates that plaintiff presented to the emergency room of St. Louis Children's Hospital in March of 2006 with complaints of a back injury during baseball practice. (Tr. 199). He was diagnosed with a muscle strain, and advised to use a heat pack and Ibuprofen. (<u>Id.</u>)

On April 3, 2006, plaintiff was admitted to the pediatric intensive care unit of St. Louis Children's Hospital due to asthma. (Tr. 193-98). Chest x-ray performed on April 3, 2006 revealed likely pneumonia in the left lower lobe of the lung, although clinical correlation was recommended. (Tr. 217). He was discharged on April 7, 2006, and advised to use Advair, Singulair, Albuterol and Prednisone. (Tr. 191-92; 197-98; 213-17).

On May 15, 2006, plaintiff returned to Dr. Cannon's office and was seen by John Spivey, M.D., for a follow-up visit for what was described as "severe persistent/fatality-prone asthma," and it was noted that he was last seen on June 21, 2004. (Tr. 180-82). Dr. Spivey noted that plaintiff remained symptomatic despite maintenance therapy, and had complaints of nocturnal cough and

marked symptomatology with exercise; however, it was noted that Advair helped plaintiff's symptoms. (Tr. 180).

Dr. Spivey noted that plaintiff had begun smoking one to two packs of cigarettes per day, and also noted that he had advised plaintiff to stop smoking. (Id.) Dr. Spivey also noted that plaintiff had been "nonadherent" with his asthma regimen in the past, and had done much better on Advair since his hospital discharge. (Tr. 181). He noted that plaintiff should continue using Advair daily, and that, if he remained compliant, his dosage could be reduced.[10] (Id.)

The record contains a Childhood Disability Evaluation Form, which was signed by psychologist R. Moreno on June 20, 2006, and by pediatrician Despine Coulis, M.D. on July 13, 2006. (Tr. 130-36). It was opined that plaintiff's asthma represented a severe impairment, but was not of listing-level severity. (Tr. 130). Plaintiff's functioning in each of the 6 domains of functioning was evaluated, and it was opined that plaintiff had "no limitation" in his ability to interact/relate with others; move about and manipulate objects; or care for himself. (Tr. 132-33). It was opined that plaintiff had a "less than marked" limitation in his ability to acquire and use information. (Tr. 132).

In the domain of Health and Physical Well-Being, the box

---

[10]In the office note, it is indicated that Dr. Cannon had personally interviewed plaintiff and his family; examined plaintiff; and discussed the case with Dr. Spivey, and that she agreed with the findings, assessment, and plan Dr. Spivey described. (Tr. 182).

indicating a "marked" limitation was checked. (Tr. 133). It was noted that lung function testing on May 15, 2006 revealed an FEV of 2.21, above the 1.55 or less required under listing 103.03A. (Id.) It was noted that plaintiff's primary care clinic had been contacted, and that plaintiff had not been seen there in the past year, except for one visit for immunizations. (Tr. 133, 135). It was noted that in the past year, plaintiff appeared to be without asthma exacerbations until February 2006 and April 2006, when he was hospitalized. (Tr. 135). It was noted that plaintiff had had a total of three courses of oral steroids, and the equivalent of four asthma exacerbations, including the equivalent of two for the hospitalization and one for the steroid course begun just prior to his May 15, 2006 clinic visit. (Id.) It was noted that plaintiff did not have medical evidence of chronically abnormal imaging as required under listing 1103.C1 and C2. (Tr. 135-36). It was noted that the family's allegations were partially credible and that plaintiff's asthma was severe, but he did not meet a listing for asthma. (Tr. 136).

On August 22, 2006, plaintiff was examined by Dr. Cannon. (Tr. 207). Dr. Cannon noted that, while Advair non-compliance had been noted during plaintiff's last visit of May 15, 2006, since then, plaintiff had been using Advair and reported "feeling good." (Id.) Plaintiff also reported having reduced his cigarette use to 10 cigarettes per week, and attributed some of his improvement to these smoking cessation efforts. (Id.) Plaintiff reported that he

had not had a course of Prednisone since May of 2006, and he had no episodes of cough, wheeze, shortness of breath, or chest tightness. (Id.) Plaintiff reported that his asthma had "not been bothering him lately," and he reported adherence to his asthma action plan. (Tr. 207). Lung function tests were consistent with a mild obstructive process, and were somewhat improved since plaintiff's May visit. (Tr. 208). Plaintiff was continued on his current regimen, and was advised to stop smoking. (Id.)

On May 31, 2007, plaintiff returned to Dr. Cannon's office and was evaluated by Jodi E. Carter, R.N., although both she and Dr. Cannon signed the treatment note. (Tr. 220-22). It was noted that, when last seen, plaintiff's asthma was well-controlled. (Tr. 220). It was also noted that plaintiff had been scheduled to be seen the preceding day, but did not appear as scheduled and that he was contacted and the appointment was rescheduled. (Id.) Plaintiff and his mother reported that, during the interval since his last visit, he had been doing fairly well, and reported two exacerbations brought on by upper respiratory tract infection symptoms, and weather changes. (Id.) He reported currently working a job doing manual labor, and stated he was able to do this fairly well if he pre-treated with Albuterol. (Id.) Plaintiff reported that he was trying to cut back on smoking, and stated that he smoked four to five cigarettes per day. (Tr. 221). The results of lung function testing was consistent with mild intra-thoracic airflow obstruction. (Id.) It was opined that plaintiff's asthma

was "severe persistent, uncontrolled." (Id.)  It is indicated that the option of using Xolair[11] to better control plaintiff's asthma was considered, but that plaintiff was hesitant regarding using an injection.  (Id.)  The clinician further noted her concerns about whether plaintiff would be able to comply with the two week visit schedule.  (Tr. 221).  It was also noted that smoking cessation was reviewed.  (Id.)

    C.   <u>Other Evidence</u>

In September of 1999, plaintiff was evaluated by his school district.  (Tr. 118-28).  During I.Q. testing, plaintiff achieved a score of 91 on the Kaufman Brief Intelligence Test, and a score of 93 on the Stanford-Binet Intelligence Scale.  (Tr. 120). It was noted that plaintiff was quiet and well-behaved, and that he complied with the teacher's directives to the class.  (Id.) Plaintiff was also described as an "appealing youngster who entered all testing sessions in a pleasant, friendly and cooperative manner." (Tr. 124).  It was noted that he had a medical diagnosis of ADHD, and that when he took his medication, he had "no difficulties" with attention, concentration, or impulsiveness, and that his classroom behavior was well controlled.  (Id.) Plaintiff's task focus and attention were adequate, and his

---

[11]Xolair, or Omalizumab, is administered via injection and is used to decrease the number of asthma attacks in people with allergic asthma. It is usually injected in a doctor's office every two to four weeks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603031.html

activity level was normal. (Id.) It was noted that his Full Scale I.Q./Composite I.Q. score of 93 on the Stanford-Binet fell within the average range of cognitive ability, and that his scores in reading were below his ability. (Tr. 127).

Disciplinary records from Marquette High School indicate that, in 2005 and 2006, plaintiff was subjected to various in-school suspensions and out-of-school suspensions for disruptive/disrespectful conduct, insubordination, and for stealing/possession of stolen property. (Tr. 92-94). Plaintiff's high school grade cards showed grades of mostly As and Bs, and a D+ in Geometry. (Tr. 90).

An Individualized Education Program ("IEP") was initiated for plaintiff by Marquette High School on February 3, 2006. (Tr. 103). It was indicated that plaintiff had difficulty "reading/utilizing and applying what he reads; difficulty with writing tasks, especially longer ones," and it was noted that plaintiff learned best through a multi-modality approach, and a structured environment. (Tr. 104). It was noted that plaintiff had a good sense of humor; was a good worker when he wanted to be; that he had earned As and Bs in school; and that he continued to make steady improvement with reading and writing skills. (Id.) It was noted that plaintiff had a medical diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD") with "inconsistent medical usage," and that recent state standardized testing revealed that he was "progressing" in math and science. (Tr. 104). It was noted

-13-

that he made sufficient progress.  (Tr. 106).  Plaintiff endorsed secondary goals such as attending college and living independently, and stated that he enjoyed many sports and "hanging out with friends."  (Tr. 111).

## III.      The ALJ's Decision

The ALJ in this case determined that plaintiff had not engaged in substantial gainful activity since the date his application was filed.  (Tr. 19).  The ALJ analyzed plaintiff under both the childhood and the adult listings of impairments.  (Tr. 15-26).

The ALJ determined that, before plaintiff attained the age of 18, he had the severe impairment of asthma, but did not have an impairment or combination of impairments that met or medically equaled, or that functionally equaled, a listed impairment.  (Tr. 19).  In so finding, the ALJ analyzed the medical evidence of record, and analyzed plaintiff's functioning in each of the six domains of functioning, and determined that, before attaining the age of 18, plaintiff had a "less than marked" limitation in the domains of Acquiring and Using Information; Attending and Completing Tasks; and Health and Physical Well-Being.  (Tr. 23-25). The ALJ determined that plaintiff had "no limitation" in the domains of Interacting and Relating to Others; Moving About and Manipulating Objects; and Caring for Yourself.  (Tr. 24).  The ALJ

concluded that, because plaintiff did not have an impairment or combination of impairments that met, medically equaled or functionally equaled a listed impairment, plaintiff was not disabled prior to attaining the age of 18. (Tr. 25).

The ALJ also determined that plaintiff, since attaining age 18, continued to have a severe impairment/combination of impairments, but had developed no new impairments. (Id.) The ALJ determined that, since attaining age 18, plaintiff had the residual functional capacity ("RFC") to lift and/or carry up to 10 pounds occasionally and up to five pounds frequently; sit for up to six hours in an eight-hour workday; and stand/walk for up to two hours, an RFC consistent with sedentary work. (Tr. 25-26). The ALJ also found that plaintiff had an additional limitation, in that he would need to work in a clean environment with minimal airborne pollutants. (Tr. 26).

The ALJ determined that transferability of job skills was irrelevant, because plaintiff had no past relevant work. (Id.) Using the Guidelines, the ALJ determined that jobs existed in significant numbers in the national economy that plaintiff could perform. (Id.) In so finding, the ALJ noted that plaintiff's additional limitations had little to no effect on the occupational base of unskilled sedentary work. (Id.) The ALJ concluded that plaintiff had not been under a disability, as such is defined in the Act, at any time through the date of his decision. (Tr. 26).

## IV.     Discussion

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undertake a three-step sequential evaluation process, found at 20 C.F.R. § 416.924(a), when determining whether a child is entitled to benefits. At the first step, the Commissioner must determine whether the child is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner proceeds to the second step and determines whether the child's impairment or combination of impairments is severe. If so, the Commissioner proceeds to step three, at which he considers whether the impairment meets, medically equals, or functionally equals a disability in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing" or "the Listings"). If the child's impairment meets or medically equals a Listing, the child is disabled. A child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a).

If the child's impairment does not meet or medically equal a Listing, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether it "functionally equals" a Listing. This analysis requires the Commissioner to assess the child's developmental capacity in the following six "domains": (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being.  See 20 C.F.R. § 416.926a(b)(1); see also Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

In order for the child's impairment to functionally equal a Listing, it must result in "marked" limitations in two domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a. A marked limitation in a domain exists when the child's impairment seriously interferes with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An extreme limitation exists when the child's impairment interferes very seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). Extreme limitation is the rating given to the worst limitations. Id. Absent a finding that the child's impairment functionally equals a listed impairment, the child is not disabled.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. §

405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating whether substantial evidence supports the decision, this Court must consider evidence which supports the Commissioner's decision, as well as any evidence that fairly detracts from the ALJ's findings. <u>Id.</u>; <u>see also</u> <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991). However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992) (citing <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184 (8th Cir. 1989)).

In the case at bar, plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for his determination that plaintiff did not meet subsection C of the childhood listing for asthma, Listing 103.03. In support, plaintiff argues that the evidence of record documented that he had been prescribed corticosteroids on a fairly continuous basis, and also notes that the medical expert testified that plaintiff had low-grade wheezing

in between acute asthma attacks.[12]  Plaintiff also argues that the ALJ failed to articulate a legally sufficient rationale for finding that he had "less than marked" limitations in the domains of Health and Physical Well-Being, and Interacting and Relating with Others.

Plaintiff also challenges the ALJ's findings under the adult standards, arguing that the ALJ's residual functional capacity ("RFC") finding is not supported by medical evidence addressing his ability to function.  Finally, plaintiff argues that, because there is evidence of a significant non-exertional impairment, the decision is insufficient because it lacks vocational expert testimony.  In response, the Commissioner contends that the decision is supported by substantial evidence on the record as a whole.

A.    Listing 103.03C

Plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for his finding that plaintiff did not meet section C of Listing 103.03, the Listing for childhood asthma. Review of the decision reveals no error.

The burden of proof is on the plaintiff to establish that his impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.  2004) (citing Sullivan v. Zebley,

___
[12]Plaintiff does not contend that he meets any of the other sections of Listing 103.03, which contain the criteria of FEV1 readings; asthma attacks; and growth impairment.  20 C.F.R. 404, Subpt. P, App. 1, § 103.03.  Plaintiff submits no arguments related to allegations of impairments other than asthma.

493 U.S. 521, 530-31 (1990)).  To meet a listing, an impairment must meet all of the listing's specified criteria.  <u>Id.</u> (citing <u>Sullivan</u>, 493 U.S. at 530) ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.").

The specified criteria for subsection C of Listing 103.03 are as follows:

> Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
>
> 1.  Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
>
> 2.  Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period.
>
> 20 C.F.R. 404, Subpt. P, App. 1, § 103.03C.

In support of his argument, plaintiff claims that the medical expert testified that plaintiff had been prescribed a corticosteroid[13] on a fairly consistent basis, and that he experienced low-grade wheezing between asthma attacks.  However, plaintiff presents no evidence that he had "persistent" low grade wheezing, or that he used corticosteroids more than five days per month for at least three months in a 12-month period, as the listing requires.  As the Commissioner correctly notes, plaintiff cannot meet the specific criteria of the listing merely by pointing

_____

[13]Prednisone is a corticosteroid.

to testimony that he experienced some wheezing and had been prescribed corticosteroids. In addition, the medical evidence of record supports the ALJ's conclusion. For example, while plaintiff was indeed hospitalized once for an asthma attack, he told Dr. Cannon on August 22, 2006 that he had experienced no episodes of cough, wheeze, shortness of breath, or chest tightness, and stated that his asthma was not bothering him. (Tr. 207). During a clinical examination on May 31, 2007, Nurse Carter noted no wheezing. (Tr. 221). In order to meet a listing, an impairment must meet all of the listing's specified criteria. Id. (citing Sullivan, 493 U.S. at 530). As noted above, to meet subsection C of Listing 103.03, plaintiff must demonstrate that he has "persistent" wheezing in between acute asthma attacks. The ALJ's conclusion that plaintiff did not meet the requirements of Listing 103.03 is supported by the record.

B.    Functional Equivalency

Having determined that plaintiff's impairment did not meet or medically equal the listing for childhood asthma, the ALJ analyzed plaintiff's impairment in each of the six domains of functioning, and determined that plaintiff did not functionally equal a listing. Specifically, the ALJ determined that plaintiff had "less than marked" limitations in the domains of Acquiring and Using Information, Attending to and Completing Tasks, and Health and Physical Well-Being; and determined that he had no limitations

in the domains of Interacting and Relating to Others, Moving About and Manipulating Objects, and Caring for Yourself.

Plaintiff challenges the ALJ's findings related to the domains of Health and Physical Well-Being, and Interacting and Relating to Others.  In support of his arguments related to the first domain, plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for his determination, and argues that the non-examining physicians both indicated that plaintiff had a "marked" impairment in this domain.[14]  Regarding the domain of Interacting and Relating with Others, plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for his finding that plaintiff had no impairment.[15]  Review of the decision reveals no error.

As noted above, if it is determined that a child's impairment does not meet or medically equal a listing, the ALJ determines whether it results in limitations that functionally equal the listing.  20 C.F.R. § 416.926a(a).  Functional equivalency in children means that the impairment must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.  Id.  A "marked" limitation is one that

_____

[14]Plaintiff is apparently referring to the Childhood Disability Evaluation Form completed and signed by Psychologist R. Moreno on June 20, 2006, and by pediatrician Despine Coulis, M.D. on July 13, 2006, detailed above.

[15]Plaintiff does not specifically challenge the ALJ's findings regarding any of the other four domains, nor does he argue that he had "extreme" limitations in any of the six domains of functioning.

is more than moderate but less than extreme, and which "interferes seriously" with the child's ability to "independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2).

### 1.  Interacting and Relating With Others

In assessing a child's limitations in the domain of interacting and relating with others, the ALJ considers how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responses to criticism and respects and takes care of the possessions of others.  20 C.F.R. § 416.926a(i); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 654 (8th Cir. 2004).  In adolescents (those age 12 to the attainment of age 18), it is expected that the child will have the ability to initiate and develop friendships with peers; to relate appropriately to other children and adults; recognize social rules; intelligibly express feelings and ask for assistance; seek information; describe events and tell stories in different environments and among different people.  20 C.F.R. § 416.926a(i)(2)(v).

In the case at bar, the ALJ determined that plaintiff had no limitations in this domain.  Plaintiff suggests that the "only rationale" the ALJ gave for his finding was that plaintiff's school described his classroom behavior as "well-controlled with medication as well."  (Docket No. 13 at 13).  However, in support of his determination, the ALJ actually noted that plaintiff had not

-23-

alleged a problem in this area; that there was no evidence of such a problem; and that plaintiff's school district described his classroom behavior as well-controlled with medication. (Tr. 24). Substantial evidence supports the ALJ's determination. As noted above, when plaintiff was evaluated by his school in 2006, it was noted that he had a good sense of humor; that he was a good worker when he wanted to be; that he earned As and Bs in school; and that he continued to make steady improvement with reading and writing skills. (Tr. 104). Even though plaintiff did have an IEP which specified difficulty in some academic areas and the need for certain accommodations, it was noted that recent standardized testing revealed that he was "progressing" in math and science, and that plaintiff stated that he enjoyed many sports and "hanging out with friends." (Tr. 111).

Plaintiff directs the Court's attention to school records documenting disciplinary action taken against him, and suggests that the records "clearly identify problems with interaction with others." (Docket No. 13 at 13). Indeed, the disciplinary records are evidence that plaintiff failed to follow certain school rules. They do not, however, rise to the level of supporting the conclusion that plaintiff had limitations that "interfered seriously" with his ability to initiate, sustain or complete activities, as would be required for a finding of a "marked" limitation. The record contains other evidence documenting plaintiff's good academic performance; the fact that he was a good

worker when he wanted to be; was progressing academically; and that he enjoyed playing sports and hanging out with friends. Also, during the administrative hearing, plaintiff testified that, when he had trouble understanding something, he asked his teacher to help him (Tr. 234); that he had helped a friend with a job (Tr. 235); that he was a honor roll student; (Tr. 237) and that math was his favorite subject. (<u>Id.</u>) For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's determination that plaintiff did not have a limitation in the domain of Interacting and Relating to Others.

### 2. <u>Health and Physical Well-Being</u>

In assessing a child's level of limitation in the domain of Health and Physical Well-Being, the ALJ considers the cumulative physical effects of physical and mental impairments, and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects.[16] 20 C.F.R. § 416.926a(1).

The ALJ in this case determined that plaintiff had a "less than marked" limitation in the domain of Health and Physical Well-Being, inasmuch as the evidence showed that, although plaintiff would have limitations in physical functioning due to occasional nebulizer treatments and asthma exacerbations that

---

[16]In the domain of Moving About and Manipulating Objects, the ALJ found that plaintiff had no limitations, and noted that no such impairment had been alleged. (Tr. 24). Plaintiff does not challenge this finding.

interfered with physical functioning, he would not be limited to a marked degree. (Tr. 25). Plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for this determination. In support, plaintiff directs the Court's attention to the report completed by the non-examining physicians, in which the "marked" box was checked in the domain of Health and Physical Well-Being. Review of the decision reveals no error.

In his decision, the ALJ fully analyzed the medical evidence from plaintiff's treating physicians documenting plaintiff's treatment for asthma. The ALJ also discussed plaintiff's hospital records, and his school records. While the ALJ did not mention the findings of R. Moreno and Dr. Coulis, such omission is not error. While an ALJ is required to develop the record fully and fairly, he is not required to discuss every piece of evidence submitted, and a failure to cite a particular report does not necessarily mean that the ALJ did not consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Wheeler v. Apfel, 224 F.3d 891, 895 n. 3 (8th Cir. 2000) (the fact that the ALJ did not attempt to describe the entirety of claimant's medical history does not support the argument that the ALJ disregarded certain aspects of the record). Furthermore, psychologist R. Moreno and Dr. Coulis were consultants who had never examined plaintiff, and their conclusion was therefore not binding upon the ALJ. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant

once or not at all does not generally constitute substantial evidence.") In addition, as the Commissioner notes, the report was completed shortly after plaintiff's alleged onset date, which coincided with his April 2006 hospitalization, and that plaintiff subsequently began taking his medication, and his condition improved.

The undersigned also notes that the opinion upon which plaintiff rests was conclusory, and was not fully supported by the other notations in the report itself, or in the evidence in the record as a whole. In that same report, psychologist R. Moreno and Dr. Coulis note plaintiff's medical encounters for asthma, including his hospitalization, and his discharge to home with oral steroids. (Tr. 133). It is also noted that plaintiff continued to experience symptoms, and that expiratory wheeze was noted on clinical exam on May 15, 2006, but FEV1 values were 2.21, above the 1.55 required under Listing 103.03, and plaintiff did not visit the pulmonary clinic after this date. (Tr. 133-36). It is also noted that plaintiff had not been seen by his primary care clinic in the past year; did not use steroids for more than five days per month for three months; and had no abnormal imaging. (Id.) It was concluded that plaintiff did not meet a listing for asthma. (Tr. 136). An ALJ is entitled to disregard the opinion of even a treating physician if that physician offers opinions inconsistent with his or her own findings, or with the record as a whole. See Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009) (citing Goff

<u>v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005)).

Plaintiff presents no evidence from the relevant time period indicating that his asthma interfered seriously with his ability to independently initiate, sustain, or complete activities, as required for a finding of a "marked" limitation. <u>See</u> 20 C.F.R. § 416.926a(e)(2). In fact, in August of 2006, plaintiff reported that he felt good; his asthma was not bothering him; and he had no symptoms of coughing, wheezing, shortness of breath, or chest tightness. (Tr. 207). In May of 2007, plaintiff reported doing fairly well, and also stated that he was working. (Tr. 220). The record also indicates that plaintiff's asthma improved when he was compliant with his medication. (Tr. 80, 207). Finally, even if it could be said that the ALJ erroneously failed to find that plaintiff had a "marked" limitation in the domain of Health and Physical Well-Being, such would not change the outcome of plaintiff's case, inasmuch as findings of "marked" limitation in two domains were required to achieve functional equivalence.

Therefore, for all of the foregoing reasons, the undersigned finds that the ALJ's determination that plaintiff did not meet, medically equal, or functionally equal the childhood listing for asthma is supported by substantial evidence on the record as a whole.

C.    <u>The ALJ's RFC Determination</u>

Having addressed the childhood listings, the ALJ continued his decision with an analysis of plaintiff's allegations

under the adult standards of disability. The ALJ determined that plaintiff continued to have the severe impairment of asthma after attaining the age of 18, but had developed no new impairments. The ALJ determined that plaintiff had no past relevant work, and determined that he retained the residual functional capacity to lift and/or carry up to 10 pounds occasionally and up to five pounds frequently; sit for up to six hours in an eight-hour workday; and stand/walk for up to two hours in an eight-hour workday. The ALJ also found that plaintiff had an additional limitation, "in that he would need to work in a clean environment with minimal airborne pollutants." (Tr. 26).

Plaintiff challenges the ALJ's RFC determination, arguing that it is unsupported by medical evidence that addresses plaintiff's ability to function in the workplace, and also suggests that the ALJ failed to ensure a fully developed record. In response, the Commissioner contends that it is plaintiff's responsibility to provide medical evidence that he is disabled, and the fact that the record lacks medical evidence to establish disability does not defeat the ALJ's decision. Review of the ALJ's decision reveals that his RFC determination is not supported by substantial evidence on the record as a whole, because the record contains no medical evidence addressing how plaintiff's impairment affects his ability to function in the workplace.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245

-29-

F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

"RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (quoting Bradshaw v. Heckler, 810 F.2d 786, 790 (8th Cir. 1987)). The ALJ's RFC determination must therefore be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis, 353 F.3d at 646 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing. Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence. Id.

In the case at bar, plaintiff presented medical evidence establishing that he suffered from the medically determinable impairment of asthma. As noted above, the ALJ determined that plaintiff's asthma was a severe impairment. However, it is unclear from this administrative record how plaintiff's severe impairment

of asthma affects his residual functional capacity to function in the workplace. While the administrative record contains numerous treatment records addressing, <u>inter alia</u>, plaintiff's subjective complaints, findings upon physical exam and pulmonary function study, and plaintiff's diagnosis, none of the medical evidence addresses how plaintiff's severe impairment affects his ability to function in the workplace, as required. <u>See</u> <u>Nevland</u>, 204 F.3d at 858.

The undersigned notes that it appears plaintiff is able to enjoy a relatively normal and active life (including evidence that plaintiff played sports, socialized with friends, and attended school), and that plaintiff's medical records do not necessarily suggest that plaintiff is disabled from all work. However, while the ALJ was not limited to considering only medical evidence when determining plaintiff's RFC, medical evidence was required to establish how plaintiff's asthma affects his ability to function in the workplace. <u>Lauer</u>, 245 F.3d at 704. An ALJ is not permitted to draw his own inferences from the medical evidence. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000) (citations omitted). Because this administrative record contains no *medical* evidence which actually addresses how plaintiff's asthma affects his ability to function, it cannot be said with certainty that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. Again, the issue is not whether plaintiff has an impairment; the issue is how plaintiff's impairment affects his

ability to physically function in the workplace.  <u>Lewis</u>, 353 F.3d at 646; <u>Krogmeier</u>, 294 F.3d at 1023; <u>Nevland</u>, 204 F.3d at 858.

Plaintiff also contends that the ALJ's failure to elicit vocational expert ("VE") testimony was error, because the ALJ determined that plaintiff had the additional limitation of the need to "work in a clean environment with minimal airborne pollutants." (Tr. 26).  In response, the Commissioner argues that the presence of a non-exertional impairment does not preclude the use of the Medical-Vocational Guidelines (also "Guidelines" or "Grids") when such impairment does not "diminish or significantly limit" his RFC to perform the full range of activities listed in the Guidelines. (Docket No. 18 at 18).

The Medical-Vocational Guidelines are a set of rules that direct whether the claimant is or is not disabled "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  An ALJ may rely upon the Guidelines if the record supports the ALJ's finding that the non-exertional impairment does not diminish the claimant's RFC to perform the full range of activities.  <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 768-69 (8th Cir. 2003).

In the case at bar, the undersigned has determined that the ALJ's RFC determination is not supported by substantial evidence on the record as a whole, and therefore does not reach

plaintiff's allegation concerning the ALJ's reliance upon the Guidelines. Upon remand, it will be for the Commissioner in the first instance, after properly developing the record and determining plaintiff's RFC, to decide whether to rely upon the Guidelines, or obtain vocational expert testimony.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner pertaining to the period before plaintiff attained the age of 18 years is **AFFIRMED** as stated herein.

**IT IS FURTHER ORDERED** that the decision of the Commissioner pertaining to the period after plaintiff attained the age of 18 years is **REVERSED** and this cause **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

Judgment shall be entered accordingly.

_Frederick R. Buckles_

FREDERICK R. BUCKLES
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of March, 2010.